United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| USE TECHNO CORPORTATION AND FUTOSHI MATSUYAMA,<br><br>Plaintiffs,<br><br>v.<br><br>KENKO USA, INC., et.al.,<br><br>Defendants. | No. C-06-02754 EDL<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

On April 24, 2006, Plaintiffs Use Techno Corporation and Futoshi Matsuyama (collectively "Plaintiffs") filed this patent infringement case against Defendants Iovate Health Sciences USA, Inc., Jarrow Formulas, Inc., Jarrow Industries, Inc., Kenko USA, Inc., Soft-Gel Technologies, Inc.,Chemco Industries, Inc., Ronald Udell and Siva Hari (collectively, "Defendants"), alleging that Defendants infringed Plaintiffs' United States Patents Nos. 6,485,760 ("the '760 patent") and 6,716,459 ("the '459 patent"), and that Defendants' United States Patent No. 6,784,206 ("the '206 patent") is invalid.[1]  On July 13, 2007, the Court granted Defendants' Motion for Summary Judgment as to claims of direct infringement of the '760 patent, granted Plaintiffs' Motion to Dismiss as to claims of contributory infringement or inducement of infringement against Defendants with respect to the '760 patent and granted Plaintiffs' Motion to Dismiss as to the declaratory relief

---

[1] Plaintiffs' claims against Iovate Health Sciences USA, Inc., Jarrow Industries, Inc., Jarrow Formulas, Inc. and Siva Hari have either been settled or are in the process of settling.  Ronald Udell has been dismissed from this case.  The remaining Defendants are Kenko USA, Inc., Soft-Gel Technologies and Chemco Industries, Inc.

1  claim for the '209 patent.

2  On July 24, 2007, Defendants filed a motion for summary judgment that the '459 patent is
3  invalid for failure to comply with the enablement requirement of 35 U.S.C. § 112 and for failure to
4  name the correct inventors under 35 U.S.C. § 102(f), and unenforceable for inequitable conduct.
5  This matter was fully briefed and the Court held a hearing on August 28, 2007.  For the reasons set
6  forth below, Defendants' motion for summary judgment is granted.

7  **BACKGROUND**

8  According to the complaint, Plaintiffs' business is related to "studying natural active
9  chemical compounds and developing, patenting and licensing the application developed."  Am.
10 Compl. ¶ 1.  Plaintiffs have identified corosolic acid as a specific extract of the Banaba plant
11 (*Lagerstroemia speciosa* (Lin. or Pers.)) leaves that has been found to maintain healthy blood sugar
12 levels in humans.  Id.   Plaintiffs are "engaged in the business of planting, harvesting, extracting,
13 marketing, and selling corosolic acid extracts for the prevention and treatment of diabetes, obesity,
14 constipation and skin diseases."  Id.  Plaintiff alleges that it owns the '459 patent and that
15 Defendants are infringing the '459 patent by importing, making, using, offering for sale and selling
16 products containing corosolic acid.  Am. Compl. ¶ 61.

17 The Court issued its claim construction of the '459 patent on July 24, 2007.

18 **DISCUSSION**

19 **A.      Summary judgment standard**

20 Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be
21 rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file,
22 together with the affidavits, if any, show that there is no genuine issue as to any material fact and
23 that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Material
24 facts are those that may affect the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477
25 U.S. 242, 248 (1986).  A dispute as to a material fact is "genuine" if there is sufficient evidence for a
26 reasonable jury to return a verdict for the nonmoving party. See id.  The court may not weigh the
27 evidence. See id. at 255.  Rather, the nonmoving party's evidence must be believed and "all
28 justifiable inferences must be drawn in [the nonmovant's] favor." United Steelworkers of Am. v.

2

1  Phelps Dodge Corp., 865 F.2d 1539, 1542 (9th Cir. 1989) (en banc) (citing Liberty Lobby, 477 U.S.
2  at 255).

3       The moving party bears the initial responsibility of informing the district court of the basis
4  for its motion and identifying those portions of the pleadings, depositions, interrogatory answers,
5  admissions and affidavits, if any, that it believes demonstrate the absence of a genuine issue of
6  material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the nonmoving party
7  will bear the burden of proof at trial, the moving party's burden is discharged when it shows the
8  court that there is an absence of evidence to support the nonmoving party's case. See id. at 325.

9       A party opposing a properly supported motion for summary judgment "may not rest upon the
10 mere allegations or denials of [that] party's pleading, but . . . must set forth specific facts showing
11 that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); Liberty Lobby, 477 U.S. at 250.  The
12 opposing party, however, need not produce evidence in a form that would be admissible at trial in
13 order to avoid a summary judgment.  See Celotex, 477 U.S. at 324.  Nor must the opposing party
14 show that the issue will be resolved conclusively in its favor. See Liberty Lobby, 477 U.S. at 248-
15 49.  All that is necessary is sufficient evidence supporting the asserted factual dispute and requiring
16 a jury or judge to resolve the parties' differing versions of the truth at trial. See id.

17 **B.    The '459 patent in invalid for lack of enablement.**

18      The '459 patent is entitled "Composition for Inhibiting Increase of Blood Sugar Level or
19 Lowering Blood Sugar Level," and has two claims:

20     1.    A composition for inhibiting an increase in, or lowering, a blood sugar
           level, in a human patient in need thereof, consisting essentially of:
21        a concentrate of ethanol or ethanol aqueous solution extract of leaves of
       *Lagerstroemia Speciosa,* Linn. or Pers. having a corosolic acid content of
22        0.01 to 15 mg per 100 mg of the concentrate.

23     2.    The composition according to claim 1, wherein said ethanol solution
           contains 50 to 80 by weight of ethanol.
24

25 '459 patent at col. 6, lines 57-65.  Defendants specifically argue that the enablement requirement is
26 not met because the specification does not allow one skilled in the art to create a concentrate of 15%
27 corosolic acid.  The enablement requirement states:

28        The specification shall contain a written description of the invention, and of the
          manner and process of making and using it, in such full, clear, concise, and exact

3

> terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

See 35 U.S.C. § 112. "Invalidity for lack of enablement is a conclusion of law that must be supported by facts showing a failure to enable by clear and convincing evidence." National Recovery Techs., Inc. v. Magnatic Separation Sys., Inc., 166 F.3d 1190, 1195 (Fed. Cir. 1999) (internal citation omitted). The enablement requirement is met "when one skilled in the art, after reading the specification, could practice the claimed invention without undue experimentation." AK Steel Corp. v. Sallac & Ugine, 344 F.3d 1234, 1244 (Fed. Cir. 2003); see also Genentech, Inc. v. Novo Nordisk, A/S, 108 F.3d 1361, 1365 (Fed. Cir.1997) ("[t]o be enabling, the specification of the patent must teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation."); Atlas Powder Co. v. E.I. Du Pont De Nemours & Co., 750 F.2d 1569, 1576 (Fed. Cir.1984) (finding of enablement is not precluded even if some experimentation is necessary, although the amount of experimentation needed must not be unduly extensive). Several factors should be considered in deciding the issue of undue experimentation:

> (1) the quantity of experimentation necessary; (2) the amount of direction or guidance presented; (3) the presence or absence of working examples; (4) the nature of the invention; (5) the state of the prior art; (6) the relative skill of those in the art; (7) the predictability or unpredictability of the art; and (8) the breadth of the claims.

In re Wands, 858 F.2d 731, 737 (Fed. Cir. 1988). A court need not examine all of the Wands factors; they are "illustrative, not mandatory." Amgen, Inc. v. Chugai Pharmaceutical Co., 927 F.2d 1200, 1213 (Fed. Cir. 1991). "Where the specification provides 'guidance in selecting the operating parameters that would yield the claimed result,' In re Colianni, 561 F.2d 220, 224, 195 USPQ 150, 153 (C.C.P.A.1977) (emphasis omitted), it is fair to conclude that the experimentation required to make a particular embodiment is not 'undue.'" PPG Indus., Inc. v. Guardian Indus. Corp., 75 F.3d 1558, 1565 (Fed. Cir. 1996). Further, "as part of the quid pro quo of the patent bargain, the applicant's specification must enable one of ordinary skill in the art to practice the *full scope* of the claimed invention." See AK Steel, 344 F.3d at 1244 (emphasis added); see also Automotive Techs., Int'l. v. BMW of No. Am., Inc., 378 F. Supp. 2d 780, 815 (E.D. Mich. 2005) (in patent covering sensors for side airbags, the claim was construed to cover both mechanical and electronic sensors,

4

1 but the patent failed to provide sufficient details to teach a person skilled in the art how to make an

2 electronic sensor); National Recovery, 166 F.3d 1192-93 (patent covered distinguishing between

3 types of containers in the recycling industry through x-rays, but the patent failed to teach how to

4 distinguish between x-ray signals passing through an irregularity in the containers and a regular

5 container). Further,

> This is not to say that the specification itself must necessarily describe how to make and use every possible variant of the claimed invention, for the artisan's knowledge of the prior art and routine experimentation can often fill gaps, interpolate between embodiments, and perhaps even extrapolate beyond the disclosed embodiments, depending upon the predictability of the art. [internal citations omitted] *But it does mean that, when a range is claimed, there must be reasonable enablement of the scope of the range*.

AK Steel, 344 F.3d at 1244 (emphasis added).

Here, the specification in the '459 patent discloses only one method of ethanol or ethanol aqueous extraction:

> In this method, a pulverization product of dry leaves of *Lagerstroemia Speciosa*, Linn. or Pers. (raw material) added to ethanol or an ethanol aqueous solution (ethanol content 50 to 80% by weight) in an amount 5 to 20 times, preferably 8 to 10 times the weight of the raw material, and the mixture is refluxed under heat at a temperature between room temperature and 90º C., preferably approximately between 50º C. and 80º C., for 30 minutes to 2 hours. The above extraction is repeated twice or three times. The resultant extract may be decolorized as required by adding 5 to 10% by weight, based on the raw material, of activated carbon. The decolorization is useful for expanding the use range of the composition of the present invention to foods, and the like. Then, the extract is filtered and concentrated at a temperature of 60º C. or lower under reduced pressure to obtain a solid, and the solid is dried at a temperature between 50º C. and 70º C. under reduced pressure (higher reduction rate than that during the concentration). The thus-obtained solid is pulverized to obtain a powdery concentrate. The concentrate obtained by the above method has a specific content of corosolic acid and contains an effective amount of other components as well.

'459 Patent at 3:38-60.

It is undisputed that this method will not yield a concentrate of 15% corosolic acid. Inventor/Plaintiff Matsuyama himself testified that Method 1 would not yield 15% corosolic acid. Instead, one would have to know of Matsuyama's special research that is not included in the specification to yield that amount:

Q: Would Method 1 allow you to get a concentrate with 15% corosolic

|   |   |   |
|---|---|---|
| | | acid? |
| | A: | Based on our special research, the result is that *nearly that much would be obtained*. |
| | Q: | And the special research is that found in the patent application? |
| | A: | It is not included. |
| | Q: | So to get to 15% corosolic acid you would need special research that's not in the patent application? |
| | A: | It was predicted at the time of the application that it could sufficiently be obtained. It was predicted that the amount could be obtained based on special research. |
| | | . . . |
| | Q: | So you would need the special research to get corosolic acid content of 15% in the concentrate? |
| | A: | Yes, however, in 1998 at the time of this application I had discovered corosolic acid over 6% which is several tens of times greater than this in banaba leaves that had been stressed by certain insects. |
| | Q: | So if you picked leaves that had been stressed by an insect you could obtain a concentrate that had corosolic acid content of 15%? |
| | A: | That's not right. Insects are one method of applying stress. Stress could be applied with a knife by making a cut, by bringing close to fire, by making marks throughout the leaf with a Kensan which is an item used in Japanese flower arranging by putting pesticide on it, a variety of methods could be used to obtain 15%. The method that I thought of was a new method different from those methods. |
| | Q: | *Have you ever used method 1 of the patent application to obtain a concentrate of 15% corosolic acid?* |
| | A: | *Yes, I have. However, I don't recall if I used ethanol or methanol.* |
| | Q: | *And did you use your special research?* |
| | A: | *My belief is that 15% would be difficult without that special research.* |

Sankaran Decl. Ex. C at 68:24-71:9 (emphasis added). Further, in response to Defendants' interrogatory number one regarding the events leading to the conception and reduction to practice of the invention in the '459 patent, Plaintiffs stated:

> Matsuyama san ascertained the correlation and tendencies concerning the variation of Corosolic Acid contents of Banaba leaves through the analysis of many Banaba leaves. They included the findings that the contents varied in a range between one and fifty-fold according to insects-bitten, insects-stimulated, red-colored, yellow-colored, mature, fallen, young, or sprouting kinds. *Matsuyama san's discovery made it possible to choose raw materials in ways that were harvest-efficient, highyielding, waste-saving and environmentally friendly.* In the past, the Corosolic Acid content in Banaba leaves was vaguely regarded to be dependent on seasons and varieties. No one studied the relationship between physical stimulus (example, ants) or chemical stimulus (example, virus) and the Corosolic Acid content. There was no description in the past that insects or colors had a lot to do with it. *The content range between 00.01% and 15% came about because of this discovery.* Matsuyama san applied for a patent based on the described inventions and discoveries in 1998, Application No. 10-349667 [not the '459 patent].

Sankaran Decl. Ex. D at 5-6 (emphasis added).

6

Moreover, there is further evidence that one skilled in the art would not be able to achieve a 15% sample using the ethanol extraction method described in the specification. Specifically, Chihiro Mori, a Senior Researcher in the Technical Department of Tokiwa Phytochemical Company in Japan, conducted tests over an eight month period in 1998 designed to extract corosolic acid from Banaba leaves. See Mori Decl. at ¶ 5. Ms. Mori developed an extraction method using ethanol and water, which did not yield a concentrate with a corosolic acid content of more than about 3%. See Mori Decl. ¶ 16. Ms. Mori states that the extraction method contained in the '459 patent's specification would not yield more than 3% corosolic acid. See Mori Decl. ¶ 17. In November 1998, Plaintiff Use Techno requested that Tokiwa provide the extraction method used to obtain corosolic acid from Banaba leaves, and Tokiwa provided Use Techno with Ms. Mori's method. See Mori Decl. ¶¶ 15-16.

Plaintiffs have provided no evidence that one skilled in the art could use the ethanol extraction method contained in the '459 patent to obtain a concentrate of corosolic acid of 15%. Mr. Matsuyama himself testified that he could only obtain "nearly" 15% using special research that was not contained in the patent. Plaintiffs point to Mr. Matsuyama's testimony that he obtained a 100% corosolic acid sample from a professor at Hiroshima University:

> Q: Mr. Matsuyama, did you obtain a pure sample of corosolic acid in June of 1995?
> A: I'm not sure about the date, but I think I did obtain that about that time.
> Q: And who did you obtain it from?
> A: I made he request to Professor Yamazaki at Hiroshima University and Professor Yamazaki sent it to me.
> Q: Do you know what extraction method he used to obtain it?
> A: I do not know the details as to the methods he used to extract it, however, I think that the method he used was a method he referenced from an academic paper that he presented in 1993.

Andris Decl. Ex. A at 88:11-89:2. However, there is no evidence that the 100% sample was created using the method contained in the specification of the '459 patent. Rather, the record reveals that Professor Yamazaki's extraction method used methanol, rather than ethanol as described in the specification and claims. See Mori Decl. ¶ 5.

Plaintiffs also point to Mr. Matsuyama's declaration, which states conclusorily that even though it would be difficult to obtain 15% corosolic acid content, "it is actually possible to do so

7

with green leaves through repeating these processes described in the patent a number of times. In commercial practice, however, this is not economically efficient." Matsuyama Decl. ¶ 9.[2] He further states that Use Techno technologies have yielded an extraction of 99.5%. Id. at ¶ 10. Mr. Matusyama's vague and conclusory declaration, which is inconsistent with his deposition testimony on this point, is not sufficient to create a triable issue regarding enablement, especially the ability to do so without undue experimentation. The declaration does not explain how many times the processes must be completed in order to obtain a 15% sample, or even what those processes are. Even though the declaration states that the unspecified processes should be completed a number of times, the specification only states that the extraction process is repeated two or three times. In addition, in a 2002 declaration to the Patent and Trademark Office, Mr. Matsuyama testified that he used the method five times, and his declaration shows that none of those times exceeded 3%, much less achieved 15%. See Andris Decl. Ex. A at Ex. 113 at 3.

In balancing the Wands factors and considering Ms. Mori's tests, the Court concludes that one skilled in the art would have to engage in undue experimentation to reach 15% corosolic acid content. The quantity of experimentation necessary, the first factor, is extensive because Mr. Matusyama names so many possible stressors that could affect the corosolic acid content of the Banaba leaves, and both the extensive experimentation of Ms. Mori and repeated extraction by Mr. Matsuyama did not yield anything even close to 15%. Rather, Mr. Matsuyama's undisclosed special research was required to achieve this result using ethanol. The second factor, the amount of direction or guidance presented, weighs in favor of finding undue experimentation. Specifically, there is no indication in the specification that leaf selection is an issue or that leaf selection would make a difference in reaching the upper range of the percentage of corosolic acid. Even if it were common knowledge that leaves have different levels of corosolic acid, there is no direction in the patent as to which kind of stressed leaves should be used. The third factor, the presence or absence

---

[2] Commercial viability is not necessary to show enablement. See Automotive Techs Int'l, 378 F. Supp. 2d 780, 813 (citing CFMT Inc. v. Yieldup Int'l Corp., 349 F.3d 1333, 1339 (Fed. Cir.2003) ( "Patents are not production documents, and nothing in the patent law requires that a patentee must disclose data on how to mass produce the invented product .... [T]he law requires that patents disclose inventions, not mass-production data, and that patents enable the practice of inventions, not the organization and operation of factories.") (quoting Christianson v. Colt Indus. Operating Corp., 822 F.2d 1544, 1562 (Fed.Cir.1987))).

8

of working examples, weighs in favor of finding undue experimentation because there is only one method disclosed in the patent and it admittedly does not allow the practitioner to reach the upper range. The fourth factor, the nature of the invention, is a neutral factor. The fifth and sixth factors, the state of the art and the relative skill of those in the art, weighs in favor of finding undue experimentation because Plaintiff admits in the interrogatory response that one skilled in the art would not have known the relationship between certain types of leaves and corosolic acid content. The seventh factor, the predictability or unpredictability of the art, also weighs in favor of undue experimentation because the chemical arts are unpredictable. Glaxo Wellcome, Inc. v. Eon Labs Mfg., Inc., 2002 WL 1874830, *5 (S.D. N.Y. 2002); PPG Indus., 75 F.3d at 1564 ("In unpredictable art areas, this court has refused to find broad generic claims enabled by specifications that demonstrate the enablement of only one or a few embodiments and do not demonstrate with reasonable specificity how to make and use other potential embodiments across the full scope of the claim."). Finally, the eighth factor, the breadth of the claims, weighs in favor of finding undue experimentation because the claim undisputedly covers concentrates with 15% corosolic acid.

Further, to the extent that special Banaba leaves are required to reach the 15% level, the specification shows a lack of disclosure of the necessary starting material. See Genentech, 108 F.3d at 1366 (holding that the failure to describe a specific material to be used in practicing the patent showed lack of enablement). Plaintiff argues that the specification discloses the starting material (Banaba leaves) and the method used to extract the corosolic acid (ethanol/water solution), so the specification meets the requirement of § 112. Plaintiff further argues that anyone skilled in the art could create a compound with any percentage of corosolic acid in it. But as stated above, Plaintiffs provide no evidence of anyone skilled in the art actually achieving 15% by using the specification, and there is evidence that one skilled in the art could not use the method contained in the specification to achieve a 15% sample without undue experimentation.

Accordingly, based on clear and convincing evidence, the '459 patent is invalid for lack of enablement.

**C.      The '459 patent is unenforceable for inequitable conduct.**

"To hold a patent unenforceable due to inequitable conduct, there must be clear and

convincing evidence that the applicant (1) made an affirmative misrepresentation of material fact, failed to disclose material information, or submitted false material information, and (2) intended to deceive the U.S. Patent and Trademark Office ("PTO")." Cargill, Inc. v. Canbra Foods, Ltd., 476 F.3d 1359, 1363-64 (Fed. Cir. 2007) (citing Impax Labs., Inc. v. Aventis Pharm. Inc., 468 F.3d 1366, 1374 (Fed.Cir.2006)).  Once the party asserting inequitable conduct proves a threshold level of materiality and intent by clear and convincing evidence, "[t]he court must then determine whether the questioned conduct amounts to inequitable conduct by balancing the levels of materiality and intent, 'with a greater showing of one factor allowing a lesser showing of the other.'" Digital Control Inc. v. Charles Machine Works, 437 F.3d 1309, 1313 (Fed.Cir. 2006), quoting Union Pac. Res. Co. v. Chesapeake Energy Corp., 236 F.3d 684, 693 (Fed.Cir. 2001).

The Federal Circuit recognizes several tests for the materiality element of inequitable conduct.  Under the "reasonable examiner" test, materiality requires a showing that "'a reasonable examiner would have considered such prior art important in deciding whether to allow the patent application.'" Digital Control, 437 F.3d at 1314, quoting Dayco Prods., Inc. v. Total Containment, Inc., 329 F.3d 1358, 1363 (Fed.Cir. 2003) (internal quotations omitted).  The "reasonable examiner" test is based in part on the standard of materiality articulated in the PTO's Rule 56, describing the duty of candor and good faith, or duty of disclosure, before it was amended in 1992. Id.  That regulation provided as follows:

> A duty of candor and good faith toward the Patent and Trademark Office rests on the inventor, on each attorney or agent who prepares or prosecutes the application and on every other individual who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application. All such individuals have a duty to disclose to the Office information they are aware of which is material to the examination of the application. Such information is material where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent.

Dayco Prods., 329 F.3d at 1363, n.1, quoting 37 C.F.R. § 1.56(a) (1991) (emphases added in original).  Under the "reasonable examiner" standard, prior art may be material for inequitable conduct even though it would not be invalidating. Digital Control, 437 F.3d at 1318.

The PTO's current version of Rule 56 articulates a different test of materiality, but leaves

1  intact the "reasonable examiner" standard. Digital Control, 437 F.3d at 1316. Rule 56 now provides
2  as follows:

> (b) Under this section, information is material to patentability when it is not cumulative to information already of record or being made of record in the application, and
>
>     (1)    It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or
>
>     (2)    It refutes, or is inconsistent with, a position the applicant takes in:
>         (I)    Opposing an argument of unpatentability relied on by the Office, or
>         (ii)    Asserting an argument of patentability.
>
> A prima facie case of unpatentability is established when the information compels a conclusion that a claim is unpatentable under the preponderance of evidence, burden-of-proof standard, giving each term in the claim its broadest reasonable construction consistent with the specification, and before any consideration is given to evidence which may be submitted in an attempt to establish a contrary conclusion of patentability.

37 C.F.R. § 1.56(b) (2007).

      Under the various tests of materiality, "to the extent that one standard requires a higher showing of materiality than another standard, the requisite finding of intent may be lower" on the sliding scale for inequitable conduct balancing materiality and intent. Digital Control, 437 F.3d at 1316. In other words, to establish the requisite intent "requires that 'the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive.' Intent rarely can be, and need not be, proven by direct evidence. Instead, an intent to deceive is usually inferred from the facts and circumstances surrounding the conduct at issue." Cargill, 476 F.3d at 1364 (quoting Impax Labs., 468 F.3d at 1374-75 (internal citation omitted)).

      Here, the '459 patent describes clinical tests involving 22 mild-case insulin dependent patients, and states the results of those tests in a table. See '459 patent at 6:22-55. Specifically, the patent states that "Tablet A," containing a powdery concentrate obtained using the ethanol extraction method contained in the specification, was administered to one group of these patients. See id. at 5:35-6:55. Matsuyama testified that the tests were an important part of the patent application.

11

Andris Decl. Ex. A at 105:5-8; see also Sankaran Decl. Ex. I (amendment and reply for '760 patent) ("It is totally improper to conclude that one skilled in the art would learn from Murakami that corosolic acid would be effective in treating blood sugar imbalance in human patients, much less what a suitable dosage should be for this utility.").

Yet Mr. Matsuyama also testified that the tests were not conducted:

> Q: Did UTC ever commission any clinical tests involving an alcohol extract of banaba leaves?
> A: By tests, what are you referring to?
> Q: Clinical studies.
> A: And are those tests on humans?
> Q: Correct.
> A: *None took place.*
> *Interpreter: Correction.*
> *Witness: That was not done.*

Sankaran Decl. Ex. C at 18:2-10 (emphasis added). Mr. Matsuyama also testified that there was no mistake in the patent application, but that he did not know who performed the ethanol extract study and that he performed a test at Professor Ikeda's location and looked at a large amount of data:

> Q: Patent application starting around paragraph 29 talks about a study where ethanol extract of banaba leaves is administered to patients, correct?
> Mr. Andara: Objection, assumes facts not in evidence, document speaks for itself.
> Witness: Yes.
> Mr Sankaran: Was there an answer?
> Q: Who performed that study?
> A: I stated this earlier, but that I do not know.
> Q: Is there a mistake in this patent application?
> A: It does not contain a mistake.
> Q: The patent talks about a study with ethanol extract of banaba leaves. But you're not aware of such a study, is that right?
> A: I performed a test or tests at Professor Ikeda's location, Also I have looked at a large amount of data.
> Q: So you yourself performed a clinical test on ethanol extract of banaba leaves at Professor Ikeda's location?
> A: That's not correct.
> Q: Who performed the study described –excuse me, who performed the clinical study on humans described in this patent application?
> A: *I believe that the data here was written by referring to Professor Ikeda's data as well as other data.*
> *Q: Professor Ikeda's data in Exhibit 104?*
> *A: Yes.*
> *Q: But Exhibit 104 is a hot water extract.*
> *A: Yes, that's right.*

Sankaran Decl. Ex. C at 107:10-108:20 (emphasis added). Mr. Matsuyama testified further that Professor Ikeda's data was only one reference used to create the data in the table in the patent that

12

purports to show clinical tests:

> Q: Where did the data in paragraph 31 come from?
> Mr. Andara: Objection, asked and answered.
> Witness: I think so too.
> Q: Right. Just tell me again.
> A: I believe that this was written by referencing Professor Ikeda's data.
> Q: Exhibit 104.
> A: That's right.
> Q: Any other sources for these numbers in paragraph 31?
> A: That I don't know. And here it also does not say that Ikeda performed this.
> Q: That's right, the patent application doesn't mention Professor Ikeda by name, right?
> Mr. Andara: Objection, the document speaks for itself.
> Q: Your answer, please?
> A: What is that?
> Q: What do you mean when you say here it also does not say that Professor Ikeda performed this?
> A: What I mean is that we did not copy Professor Ikeda's data as is here. Professor Ikeda's data was one important reference in creating this table.
> Q: Were there any other references used in creating the table in paragraph 31 of the application?
> Mr. Andara: Objection, asked and answered.
> Witness: Yes.
> Q: What were they?
> A: Those would be beginning with experiments with banaba leaves which began in 1957, the Itoen paper or papers, the 1993 Professor Yamazaki paper or papers and the 1990 Tomascy of Italy paper or papers. Those were a few.

Sankaran Decl. Ex. C at 109:14-111:4. This evidence demonstrates that, contrary to what the '459 patent states, the results of the clinical study did not result from the composition made by the method specified in Example 1.

According to Plaintiffs, Mr. Matsuyama did not understand the meaning of "clinical tests" as used at his deposition, and thought that the term meant "based on tests performed in a clinical setting." Pl.'s Opp'n at 11. However, the deposition transcript does not reveal that Mr. Matsuyama failed to understand that term. More importantly, there is still no evidence that the human tests reported in the patent involving taking a tablet containing corosolic acid concentrated using an ethanol method had been conducted when the application was filed.

Mr. Matsuyama's declaration filed with his opposition to Defendants' motion for summary judgment states that: "Before the patent applications, at my direction, Professor Ikeda tested corosolic acid extract on human patients. I conceived of and planned those experiments. Those are

13

what I refer to as 'clinical studies' in the patent applications." Matsuyama Decl. ¶ 11. Tellingly, the declaration does not state that the extract was made using ethanol. To the contrary, the only evidence shows that Professor Ikeda's tests were conducted using a hot water extract. Thus, there is still no evidence that human tests were done using a tablet derived from an ethanol extract as claimed in the specification. See Andris Decl. Ex. A at 66:15-67:17 (stating in part: "Q: Prior to filing this application was there a clinical trial with ethanol extract? A: I do not know about that."). Although Plaintiffs argue in the opposition that Mr. Matsuyama "used data from noted scholars and performed his own tests on human beings of the composition prepared through ethanol extract," (Opp'n at 11), there is no evidence that he conducted such tests and the specification does not say that the human test results were an amalgam of different data from various scholars.

There is a high showing of materiality in this case. The patent detailed clinical tests as if they were actually performed using a tablet prepared using an ethanol extraction method, which would be important to the reasonable patent examiner. See Cargill, 476 F.2d at 1366 ("a reasonable examiner would certainly want to consider test data that is directly related to an important issue of patentability."). In the context of the '459 patent, the tests in humans are particularly important. The patent states:

> Further, there has been no specific clinical knowledge of components of the extract of leaves of *Lagerstroemia Speciosa*, Linn. or Pers. which has/have activity in the therapy of human diabetes. . . . The present inventor has therefore studied a relationship between components of an extract of leaves of *Lagerstroemia Speciosa*, Linn. or Pers. and an increase in human blood sugar level on the basis of clinical tests.

'459 Patent at 2:1-4, 9-13. This portion of the specification could arguably not be misleading because the tests did show a relationship between corosolic acid and diabetes, albeit from corosolic acid obtained by a different extraction method. But the clinical test results contained in the '459 patent are misleading in that they describe use of Tablet A as being obtained using an ethanol extraction method, and the claim is for a concentrate of corosolic acid obtained through an ethanol extraction method. Moreover, the Patent and Trademark Office's Reasons for Allowance from the file history for the '459 patent shows that ethanol extraction process was a distinguishing feature. See Sankaran Decl. Ex. G ("As Tsunoda and Murakami teach extraction with different solvents, and

14

the content of a concentrate resulting from extraction with different solvents would be expected to be different, one skilled in the art would not have reasonable expected that a concentrate resulting from the extraction method of Tsunoda [extraction with ethanol but silent on resulting corosolic acid content] would comprise the same amount of corosolic acid as that in the concentrate of Murakami [methanol extract].  For these reasons, the claims are allowable.").

Although there is no direct evidence of intent, the totality of the circumstances shows that Mr. Matsuyama did not inadvertently err but instead intended to deceive in stating that human tests were conducted using a tablet prepared through an ethanol extraction process.  See Ferring B.V. v. Barr Laboratories, Inc., 437 F.3d 1181, 1191 (Fed. Cir. 2006), cert. denied, 127 S. Ct. 515 (2006) ("In the absence of a credible explanation, intent to deceive is generally inferred from the facts and circumstances surrounding a knowing failure to disclose material information.").  Mr. Matsuyama knew the importance of the testing on humans, yet did not actually ensure that the tests that the patent purports to show took place.  His declaration does not explain this glaring omission, much less do so credibly.

Therefore, the '459 patent is unenforceable for inequitable conduct.  In light of the invalidity and unenforceability of the patent on the grounds set forth above, the Court need not reach the issue of inventorship.

**CONCLUSION**

Accordingly, Defendants' Motion for Summary Judgment is granted.  The '459 patent is invalid for lack of enablement and unenforceable for inequitable conduct.  Because the '459 patent is invalid for these reasons, the Court need not reach the inventorship issue.

**IT IS SO ORDERED.**

Dated: September 4, 2007

*Elizabeth D. Laporte*
ELIZABETH D. LAPORTE
United States Magistrate Judge